Jeffrey W. Shields (#2948)
Blake D. Miller (#4090)
Eric P. Lee (#4870)
Paul R. Smith (#14325)
**JONES, WALDO, HOLBROOK & McDONOUGH, P.C.**
170 South Main Street, Suite 1500
Salt Lake City, Utah  84101
Telephone:  (801) 521-3200
jshields@joneswaldo.com
bmiller@joneswaldo.com
psmith@joneswaldo.com
*Attorneys for Quinn Capital Partners, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>QUINN'S JUNCTION PROPERTIES, LC,<br><br>Debtor. | Bankruptcy Case No. 16-24458<br><br>Chapter 11 |

## OBJECTION OF CREDITOR QUINN CAPITAL PARTNERS, LLC TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT

Quinn Capital Partners, LLC ("**QCAP**") hereby objects to the adequacy of the Debtor's

Disclosure Statement dated September 21, 2016 (Dkt. No. 128) (the "**Disclosure Statement**").

QCAP objects to the Disclosure Statement because (i) the Disclosure Statement fails to provide

adequate information as required by 11 U.S.C. § 1125(a), and (ii) the debtor's accompanying

proposed Plan of Reorganization (Dkt. No. 123) is not capable of being confirmed absent the

affirmative consent of QCAP.  In support of this Objection, QCAP states as follows:

## PROCEDURAL HISTORY

1.      On September 16, 2016, the Debtor filed the Plan.   The Plan was not accompanied by a disclosure statement of the time of filing as is normally required.[1]

2.      On September 22, 2016, the Debtor filed the Disclosure Statement.

3.      The Court has set a hearing to consider the adequacy of the Disclosure Statement for November 3, 2016 at 10:00 a.m. and has established October 24, 2016 as the deadline for filing objections to the Disclosure Statement

4.      On September 29, 2016, QCAP filed its Motion to Dismiss or Convert Debtor's Chapter 11 Bankruptcy Case, or in the Alternative, to Modify the Automatic Stay or Appoint a Trustee or Examiner ("**Motion to Dismiss**")(Dkt. No. 133).

## APPLICABLE LAW

5.      "The premise underlying Chapter 11 is disclosure. . . .  The disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders would make an informed judgment about a plan of reorganization."  *In re Jeppson*, 66 B.R. 269, 291 (Bankr. D. Utah 1986).

6.      Accordingly, a disclosure statement must "inform equity holders and claimants, as fully as possible, about the probable financial results of acceptance or rejection of a particular plan.  The information to be provided should be comprised of all those factors presently known

---

[1]  F. R. Bankr. P. 3016(b).  The Plan, standing alone, was filed in reference to the deadline set on the *Consent Order on Motion to Designate Quinn's Junction Properties as a Single Asset Real Estate Debtor* ("SARE Order") but was not accompanied by the Disclosure Statement which was filed four (4) days after the deadline for filing the Plan established in the SARE Order.

2

to the plan proponent that bear upon the success or failure of the proposals contained in the

plan." *In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 177 B.R. 684, 689 (Bankr.

D. Colo. 1995) (internal edits and quotation omitted).

7.      As set forth in *Jeppson*, a disclosure statement should typically contain the

following information:

1. The circumstances that gave rise to the filing of the bankruptcy petition.
2. A complete description of the available assets and their value.
3. The anticipated future of the debtor.
4. The source of the information provided in the disclosure statement.
5. A disclaimer.
6. The condition and performance of the debtor while in Chapter 11.
7. Information on claims against the estate.
8. The estimated return that creditors would receive under Chapter 7.
9. The accounting and valuation methods used in the disclosure statement.
10. Information regarding the future management of the debtor.
11. A summary of the plan of reorganization.
12. An estimate of all administrative expenses, including attorneys' fees and accountants' fees.
13. The collectibility of any accounts receivable.
14. Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan.
15. Information relevant to the risks being taken by the creditors and interest holders.
16. The actual or projected value that can be obtained from voidable transfers.
17. The existence, likelihood and possible success of non-bankruptcy litigation.
18. Any tax consequence of the plan.
19. The relationship of the debtor with affiliates.

*Id.* at 293.

8.      The information provided in a disclosure statement "must be clear and comprehensible." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

9.      "Conclusory allegations or opinions [in a disclosure statement] without supporting facts are generally not acceptable." *In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985).

## SPECIFIC OBJECTIONS TO THE DISCLOSURE STATEMENT

The Disclosure Statement is inadequate in at least the following particulars:

1.      <u>Inadequate information regarding proposed financing</u>.  The lynchpin of Debtor's Plan is the QFund financing. In addition, information regarding the feasibility of the Plan is required to be contained in the Disclosure Statement.  The feasibility of the Debtor's Plan relies on its obtaining two loans from an entity identified merely as "QFund."  The first loan will be in the approximate amount of $14,700,000.00[2] and is proposed to prime the existing liens securing the claims of QCAP.  The second loan will be in the amount of $3,000,000 and will serve as a working line of credit.

         (a)      <u>There is inadequate information regarding the relationship of QFund to the Debtor</u>. The relationship of QFund and its principals to the Debtor, including QFund's motivation for making such loans, should be identified.  The Disclosure Statement states that the

---

[2] Debtor proposes a convoluted initial distribution on the Initial Payment Date (March 31, 2017) as follows: (i) payment of $4.1 million to Bank of Utah in full payment of its first position secured claim; (ii) payment of $4.2 million to QCAP on its mechanics' lien claim; (iii) payment of $6.4 million on QCAP's lending claim (which QCAP claims exceeds $14.0 million); and (iv) payment of additional amounts to QCAP on both of its claims should the State Court determine it is owed larger secured and unsecured claims, whatever that amount may be.  Disclosure Statement at 4-5.

President and CEO of QFund is Dick Bayer. His relationship to the Debtor or its principals should be set forth, including whether he will have any role with the reorganized debtor. In addition, Quinn's Junction Partnership, a Utah general partnership and sole member of the Debtor, is proposed to have an equity interest in QFund. The Disclosure Statement should identify what that equity interest will be, including the percentage of the total equity in QFund the partnership interest will represent and state what consideration, if any, Quinn's Junction Partnership will pay for that equity. At this point, no loan documents have been presented from QFund (which has been incorporated in Colorado and lists only Mr. Bayer by name). There is not even a basic discussion in the Disclosure Statement of typical key terms of the credit facitlity.[3]

     (b)   <u>There is inadequate information regarding the ability of the Debtor to obtain a priming loan</u>. Priming an existing secured claim is never to be taken lightly and requires a showing that the Debtor is unable to obtain credit otherwise and there is adequate protection of the interest of QCAP. 11 U.S.C. § 364(d). The Disclosure Statement is silent as to facts to indicate that either of these requirements can be satisfied. While notably the Plan contains a "death trap" provision which, upon a certain election by QCAP, would theoretically remove the threat of a priming lien upon payment of a deeply discounted sum on the Initial Payment Date, a priming lien is nevertheless an event for which the Plan provides. If the debtor is unable to obtain credit under Subsections (a), (b) or (c) of Section 364 then and only then Section 364

---

[3] QCAP surmises that the reason such information is lacking is that there is none to provide; that is, there is no QFund facility in prospect.

5

ratchets up to the next level of pain for non-lender creditors by allowing existing liens to be primed in favor of the DIP lender.  Section 364(d) provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on the property of the estate that is [already] subject to a lien only if –
>
> > (A) The trustee is unable to obtain such credit otherwise; and
>
> > (B) There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

In any hearing under subsection (d), the <u>debtor</u> has the burden of proof on the issue of adequate protection.[4]  A debtor, in climbing up the ranks of remedies provided by Section 364(a)-(d), must show that it has made acceptable efforts to find credit on less severe terms than requested under the subsection of Section 364 that it invokes.[5]  The Disclosure Statement is silent on the supporting grounds for a Section 364(d) priming lien and contains no discussion of other efforts to find capital which would not require such a lien.

      (c)      <u>There is inadequate information regarding the terms of the priming loan</u>. The Disclosure Statement should contain a description of the proposed terms of the priming loan.

      (d)      <u>There is inadequate information regarding the terms and use of the proposed line of credit</u>.  The terms of the proposed line of credit should be outlined.  In addition,

---

[4]  11 U.S.C. § 364(d)(2).

[5]  *See Bray v. Ingersol-Rand Financial Credit Corp. (In re Snowshoe Company, Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *Sunstrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 690-693 (Bankr. E.D.N.C. 2009).

information should be provided which indicates that line of credit would be sufficient for the specified needs.

2.      <u>Inadequate disclosure of the ownership of Debtor</u>.  In ¶ 4.1.1 of the Disclosure Statement, MM Trust is listed as the only member of a Utah general partnership known as Quinn's Junction Partnership which in turn is the sole member of the Debtor limited liability company.  There cannot be a single member partnership.  This needs to be explained.

3.      <u>Inadequate information regarding the business of the Debtor</u>.  The Disclosure Statement is inadequate in its description of the business of the Debtor.  In fact, the entire premise of the Plan is based on unstated business operations of the Debtor.  Although the Debtor is listed as the owner of a film studio, it does not operate it.  Debtor schedules an executory contract between itself and Park City Film Studios Development Company ("PCFS") but, according to recent filings, Debtor is in the process of revising it. Similarly, it does not lease the real property and serve as a landlord.  The Debtor has no employees.  The Debtor plans on paying $120,000 a year to Mr. Ericksen for management services.  Yet, the Debtor's wholly-owned subsidiary, **PCFS** manages and operates the studio.  According to paragraph 4.2.1 of the Disclosure Statement, PCFS, not the Debtor, pays all operating costs (except for the management salary of Mr. Ericksen).  But if PCFS's costs generate net revenue, then, "in the Debtor's discretion, those net revenues would be distributed . . . to the Debtor."  Disclosure Statement, § 4.2.1.  This leaves open numerous questions:  (i) if the Debtor does not operate, manage or lease the film studio, what is its business; (ii) whose property is the income generated by the film studio; (iii) is a non-Debtor (PCFS) in possession and control of estate assets; (iv) are estate

expenses paid for by a non-Debtor; (v) are proceeds from the operation of the film studio cash collateral; (vi) is the only business of the Debtor the ownership of PCFS; and (vii) why would the Debtor require a line of credit if the expenses related to the studio are paid by another entity.[6]

4.    Inadequate information concerning the financial condition and assets of the Debtor.  In addition to failing to adequately describe the business of the Debtor, the Disclosure Statement fails provide sufficient information regarding Debtor's financial condition and its assets.  "Knowledge of the debtor's financial condition is essential before any informed decision concerning the merits of a plan can be made.  A description of available assets and their value is a vital element of necessary disclosure."  *In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985).  A mere recitation of a debtor's monthly and expenses is insufficient—those figures must be supported by documentation, including "copies of recent income tax returns to support his earning capacity."  *In re Medley*, 58 B.R. 255, 257 (Bankr. E.D. Mo. 1986).  While containing projections, the Disclosure Statement is silent on providing information about the precise source and amount  of Debtor's income (or that of PCFS as applicable) and expenses both pre- and post-petition.  While discovery has been taken from Debtor on that topic, the Disclosure Statement should be very specific in disclosing that financial information.  The Disclosure Statement lacks

---

[6] The relationship with PCFS has created no end of uncertainty in this case.  For example, in Debtor's first motion for use of cash collateral (Dkt. No. 67), it proposed that PCFS, a non-debtor, be an authorized user of cash collateral.  QCAP objected to PCFS's involvement citing that it was a non-debtor over which the Court had no jurisdiction.  *Objection of Creditor Quinn Capital Partners to Debtor's Motion for Order Authorizing the Use of Cash Collateral* (Dkt. No. 88).  Although Debtor and QCAP agreed on a consent order making Debtor responsible for the acts of PCFS and to account for the cash use, the relationship still must be clarified going to into the confirmation process particularly if the agreement is to be revised or amended.

detail about security interests in the scheduled water rights (valued at a significant amount of $815,000.00) and discloses only that a security interest in those rights will be given to QFund as part of the QFund credit facility. QCAP understands that both it and Bank of Utah hold security interests in the water rights.

5.  <u>Inadequate information concerning description of claims against the estate</u>.  While the Disclosure Statement has much to say about QCAP's claims, it provides minimal information about the claims of other creditors.  For example, there are claims scheduled for, and claims filed by, "Gregory S. Ericksen" individually and Gregory S. Ericksen Law Offices, yet Mr. Ericksen's law practice is apparently a sole proprietorship such that there is no distinction between the two. Debtor scheduled the consulting fee claim of Sahara Construction (which differs from QCAP's mechanic's lien claim) as disputed, and there is no record of Sahara having filed a proof of claim on that claim; as such, the question is one of whether that claim goes forward.  Likewise, Debtor scheduled a disputed claim from Western Capital Management for which a timely proof of claim was evidently not filed; again, is this claim still a factor in this estate?  While the proof of claim deadline for non-governmental parties expired after the Disclosure Statement was filed, nevertheless some basis for the disputes should have been explained and, if amended, the Disclosure Statement should state the status of those claims.

6.  <u>Inadequate information concerning financial projections</u>.  The Debtor (or Development) has historically been unable to obtain sufficient revenues to successfully operate the film studio.  It had one major production tenant, ABC, that cancelled its series after ten episodes and a smattering of small uses since that time (none of which are specifically described

in the Disclosure Statement).   Operation of a film studio in Utah faces a host of likely insurmountable difficulties.   *See,* generally, Motion to Dismiss.   Yet the Debtor offers an extremely optimistic pro forma that assumes a complete turnaround in the historical revenues realized by the studio.   Debtor's pro formas are woefully deficient and highly speculative.

> Merely attaching pro forma income calculations to the Disclosure Statement is insufficient.  A more detailed analysis of the projected income, expenses, and surplus funds available for satisfaction of claims and interest is appropriate.   Further, the Disclosure Statement should clearly identify all assumptions made in calculating pro forma information and should set forth those facts supporting all estimates. Information regarding the accounting and valuation methods used in preparation of the Disclosure Statement's financial exhibits must also be included.

*In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990).   The Disclosure Statement should identify the assumptions on which this amazing financial turnaround is premised.

7.     Inadequate information regarding the "deathtrap provision".   Courts have generally frowned upon "deathtrap" or "carrot and stick" provisions in plans for reorganization, which "discriminate[s] against classes who vote against a plan of reorganization."   *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 304 n.15 (Bankr. W.D. Pa. 1990); *see also In re MCorp Fin., Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex.) ("This provision is egregious in its "carrot and stick" approach to the problem of how to treat, in a plan of reorganization, an asset as highly speculative as possible recovery on a lawsuit won thus far at the United States District Court level as to liability against the FDIC.").   The Plan provisions which imposed a deathtrap election on QCAP are quite convoluted.   The Plan provides, to the extent QCAP understands it, as

follows: (i) if QCAP supports the Plan, and the State Court ultimately determines that the initial

payments made to QCAP from the QFund financing are more that what QCAP is owed, QCAP

would nevertheless get a release from the Debtor; (ii) without the release, QCAP would need to

disgorge the difference; (iii) if QCAP supports the Plan, it will received an additional

$4,000,000.00 with respect to any possible unsecured portion of its claims (as determined in the

State Court Case) and a release; (iv) if it does not support the Plan, the unsecured portion of its

claims, if the State Court determines any part of the claims is unsecured, will be paid over five

years, quarterly, at the federal interest rate.   QCAP continues to seek clarification of these

provisions.  However, the Disclosure Statement fails to explain why "support" provisions would

not apply without the "election" and simply allow the State Court case to determine the nature

and extent of the claims of QCAP.  This level is detail is needed so that QCAP can make a

rational business decision about the Plan.

8.      <u>Lack of adequate information about QFund and its ability to perform</u>.   The

Disclosure Statement provides scant information about QFund.  It states only that it is a recently

incorporated Colorado limited liability of which someone named Dick Bayer will be the

president.   In addition to the dearth of information about the QFund financing noted above,

nothing is disclosed concerning: (i) if QFund is funded; (ii) if QFund is not funded, how does it

propose to become funded; (iii) what would the sources of QFund's funds be and to what extent

would they be at risk from any lenders of those funds; (iv) will QFund have deal enhancements

such as equity in the property, equity conversion options, majority control or related terms; and

(v) what would motivate QFund to lend money to the Debtor at 1% interest per annum, with

interest only payments for 7 years, and then a seven year balloon payment—notably these terms are incredibly lax in today's lending environment. Presumably lending documents or other agreements would furnish this information (if such exists) but none have been provided. More to the point, this Plan is wholly dependent on the QFund financing and, as such, extensive detail on these points should be provided.

9. <u>Unconfirmable Plan issues</u>. As a general rule, a Court should not approve a disclosure statement if the Plan it supports cannot be confirmed. *In re 266 Washington Associates*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation."); *In re Eastern Maine Elec. Coop., Inc.*, 125 B.R. 329 (Bankr. D. Me. 1991) (same); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (same); *In re Valrico Square Ltd. Partnership*, 113 B.R. at 796 ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").[7]

---

[7] *See also, In re Pecht*, 53 B.R. 768 (Bankr. E.D. Va. 1985) ("[B]ecause the disclosure describes a plan which cannot be confirmed, the disclosure statement should not be approved."); *In re Kehn Ranch, Inc.*, 41 B.R. 832 (Bankr. D.S.D. 1984) ("[T]his Court will not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable because it does not comply with 11 U.S.C. §§ 1112(c) and 1129(a)(1)."); *In re Gingerella*, 155 B.R. 3, 4 (Bankr. D.R.I. 1993) ("Accordingly, because the Debtor's plan is premised upon the conversion to condominiums of these units, something that we now know will not happen, the disclosure statement is fatally defective on its face, and is therefore not approved.").

The Plan cannot be confirmed for a number of reasons[8].

     (a)    <u>Improper Death Trap Provisions</u>:   QCAP incorporates its argument concerning the inappropriate death trap provisions stated in paragraph 8 of this Objection above.

     (b)    <u>Improper Classification of QCAP's Alleged Unsecured Claim:</u> Debtor argues throughout this case that QCAP's lending claim, which QCAP asserts is over $14 million, is, at best, secured only to the extent of the amount of the Note, $6.4 million, leaving a multi-million dollar unsecured portion of that claim.  Debtor proposes to put all other unsecured claims in Class 4 (which are minimal and consist mostly at this point of claims of insiders) and to place the QCAP alleged unsecured claim in Class 5 by itself.  This classification scheme is improper because the QCAP unsecured claim on its lending facility, if there is to be such a claim, is "substantially similar to the other claims or interests" in Class 4.  11 U.S.C. § 1122(a); F. R. Bankr. P. 3013.  This classification proposal, particularly in light of the putative Class 4 claims consisting largely of insider claims and being minimal in amount, is an obvious attempt to create a consenting impaired class.

     (c)    <u>The Plan is a litigation based plan</u>:  Debtor is dependent upon a successful outcome of the State Court Case in order to reduce the secured debt against the Property to what it considers to be feasible levels.  However, in the Tenth Circuit, a plan which is dependent on

---

[8] QCAP provides this argument that the Plan cannot be confirmed solely for the purposes of determining whether the Disclosure Statement can be approved.  QCAP fully reserves its rights to vote for or against, or to object (or not) to the Plan, or another plan, if a disclosure statement is ultimately approved and this Plan or another plan are duly presented for confirmation. QCAP reserves the right to file objections to confirmation of the Plan (or a plan) which amplify, supplement, or differ from the plan infirmities listed here.

the outcome of litigation cannot be confirmed. *Ames v. Sundance State Bank (In re Ames)*, 973 F.2d 849, 851 (10th Cir. 1992). Debtor argues that the Plan is not a litigation based plan simply because the Plan deals with various outcomes which could be possible in the State Court Litigation. This structure, however, creates huge swings in the amount of money that QFund would have to loan depending upon the litigation outcomes of a magnitude of several million dollars. As such, this is a plan heavily dependent upon the outcomes of the State Court Case notwithstanding that the Plan contemplates various outcomes. *See In re Ames*, 973 F.2d at 851 (affirming bankruptcy court's finding that plan was not feasible because it "relied primarily upon debtors' pursuit of possible litigation"); *Matter of Bendig*, 74 B.R. 47, 48 (Bankr. D. Conn. 1987) (holding debtor's legal malpractice action "even if successful, [was] too ephemeral an asset on which to support the continuation of [the debtor's] case"); *In re FRGR Managing Member LLC*, 419 B.R. 576, 583 (Bankr. S.D.N.Y. 2009) ("[P]otential recovery from a lawsuit is insufficient to create a reasonable likelihood of rehabilitation.").

(d)     The Plan cannot pass the "best interests of creditors" test:  Under 11 U.S.C. § 1129(a)(7)(A)(ii), known as the "best interests of creditors test," a plan must provide that a non-consenting creditor must receive "not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of this title on such date." Debtor schedules its key asset, the studio property as developed, to be worth $36 million. If QCAP were to receive a completely favorable decision from the State Court and object to the Plan, total claims against this estate would be approximately $24 million. This leaves $12 million in equity in the property (this in addition to other estate property). Even if costs of sale amounted to 10%

14

of the price ($3.6 million), remaining equity for the owners would still be $8.4 million. In this case, it is mathematically impossible to for the Plan to meet the best interest of creditors test because of the dramatic spread between the alleged value of the estate assets and the maximum amount of claims under any scenario.

(e)     The Plan is not feasible:  It is axiomatic that debtors bear the burden of establishing all of the elements necessary for confirmation of a plan, including the feasibility of the plan. *See,* 11 U.S.C. § 1129(a)(11). They must provide "reasonable assurances that the plan can be effectuated…" and "[a] 'plan's income projections must be based on concrete evidence and not speculative or conjectural.'" *Ames*, 973 F.2d at 851, *quoting, In re Novak*, 102 B.R. 22, 24 (Bankr. E.D.N.Y. 1989).  Cash flow projections supporting the feasibility of a plan must be based on evidence of financial progress and must not be speculative, conjectural, or unrealistic. A glaring discrepancy between the facts surrounding a Chapter 11 debtor's past performance and debtor's predictions for the future is strong evidence that the projections are flawed, and that the proposed plan is not "feasible" as required for confirmation. *See, F.H. Partners, LP v. Investment Company of the Southwest, Inc. (In re Investment Company of the Southwest)*, 341 B.R. 298, 311 (10th Cir. BAP 2006).  Here, Debtor's past history cannot offer feasible projections for any kind of plan other than a liquidation.  This because the Property simply will not work as a production facility for the reasons stated above and there is no proof at all that the QFund proposal, even as vaguely as it is described, will be consummated.  In addition, it is clear that Debtor's projections rely heavily on replicating the usage and income patterns of the one ABC production lease.  To QCAP's knowledge, no such lease has been proposed or negotiated

nor is there any evidence that the ABC lease was more than a one-off transaction. The Disclosure Statement provides no information based on industry data, let alone actual history, to support the projections.

## CONCLUSION

Based upon the foregoing, QCAP respectfully requests that the Disclosure Statement not be approved and that any amendments to the Disclosure Statement must be re-noticed for objection and hearing.

DATED October 24, 2016.

JONES WALDO HOLBROOK & McDONOUGH, P.C.

*/s/ Jeffrey W. Shields*
Jeffrey S. Shields
Blake D. Miller
Eric P. Lee
Paul R. Smith
Attorneys for Creditor Quinn Capital Partners, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of October, 2016, I electronically filed the foregoing with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system. I further certify that the parties of record in this case as identified below, are registered CM/ECF users and will be served through the CM/ECF system:

- George B. Hofmann, ghofmann@cohnekinghorn.com; jhasty@cohnekinghorn.com; hsias@cohnekinghorn.com;
- Matthew M. Boley, mboley@cohnekinghorn.com; jhasty@cohnekinghorn.com
- Brandon T. Crowther, btc@prestonandscott.com
- Nathan Seim, seim.nathan@dorsey.com; ventrello.ashley@dorsey.com
- Steven T. Waterman, waterman.steven@dorsey.com; Bingham.karen@dorsey.com; ventrello.ashley@dorsey.com;
- Megan K. Baker, baker.megan@dorsey.com; long.candy@dorsey.com; posada.monica@dorsey.com
- John T. Morgan, United States Trustee, john.t.morgan@usdoj.gov;
- United States Trustee, USTPRegion10.SK.ECF@usdoj.gov

## Alternative Service:

I further certify that I deposited a true and correct copy of the foregoing in the United States Mail, first class postage prepaid, on this 24th day of October, 2016, and addressed to:

Stanley J. Preston,
Preston & Scott, LLC,
111 East Broadway, Suite 1200
Salt Lake City, Utah, 84111

John Curtis, CPA
Rocky Mountain Advisors
215 South State St., Suite 550
Salt Lake City, Utah 84111

_/s/ Jeffrey W. Shields_
Jeffrey W. Shields
*Attorneys for Quinn Capital Partners, LLC*

17